**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

JOSE MONTALBAN,

              Plaintiff,

v.                                     Case No. 5:16-cv-405-Oc-60PRL

FNU BOLEY, et al.,[1]

              Defendants.

_____

## <u>ORDER GRANTING DEFENDANTS' MOTION TO DISMISS</u>

### I.    Status

Plaintiff, a federal prisoner, initially filed this pro se civil rights action pursuant to *Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), on June 20, 2016.  (Doc. 1).[2]  He is currently proceeding on a Third Amended Complaint (Doc. 34), with Supplements (Docs. 36, 37),[3] against Defendants Boley, B-Unit manager; Smith, B-Unit case manager; McLean, B-Unit counselor; Heuett, H-Unit manager; Phillips, B-Unit counselor; Nikbak, a physician's assistant or doctor; Tidwell, a doctor; and two John Doe S.I.S. officers.[4]

---

[1] The **Clerk** shall correct the spelling of the following Defendants' surnames: Bolley to Boley; McClain to McLean; and Nickbath to Nikbak. <u>See</u> Motion to Dismiss (Doc. 124) at 1 n.1.

[2] For all documents filed in this case, the Court cites to the page numbers as assigned by the Court's electronic case filing system.

[3] *See* Order (Doc. 39) (granting in part Plaintiff's requests to attach supplemental material to the Third Amended Complaint).

[4] The Court previously dismissed the claims against Defendants Jarvis and Miller. *See* Order (Doc. 40).

Plaintiff claims that Defendants violated his rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments.

On January 9, 2018, the Court dismissed this case based on Plaintiff's failure to exhaust his administrative remedies. *See* Order (Doc. 89). On February 12, 2020, the Eleventh Circuit vacated and remanded the case to this Court to properly undertake the two-step exhaustion process outlined in Turner v. Burnside, 541 F.3d 1077 (11th Cir. 2008). *See* Opinion (Doc. 116); Mandate (Doc. 117). On remand, this Court permitted Defendants to file a renewed motion to dismiss and provided Plaintiff with an opportunity to respond. *See* Order (Doc. 119).

Before the Court is Defendants' Motion to Dismiss. (Doc. 124). Defendants argue that Plaintiff failed to exhaust his administrative remedies; Plaintiff does not have a cause of action pursuant to *Bivens* for the alleged violations of his First, Fifth, Sixth, or Fourteenth Amendment rights; and Defendants are entitled to qualified immunity for Plaintiff's claims under the Eighth Amendment. Plaintiff filed a Response in Opposition to Motion to Dismiss Third Amended Complaint. (Doc. 129). Plaintiff also filed several motions (Docs. 132, 133, 134, 136, 138), which the Court construes as supplemental responses.[5]

---

[5] Plaintiff seems to argue that it was error for this Court on remand to allow Defendants to file a renewed motion to dismiss. *See* Plaintiff's Response (Doc. 129 at 6-7). While Defendants expanded their exhaustion arguments and submitted different affidavits in support, their assertion remains the same—Plaintiff failed to exhaust. Likewise, Defendants' other arguments are similar to those raised in their initial motion to dismiss, in that Defendants ultimately argue that Plaintiff has failed to state a claim. Additionally, the Court provided both sides the opportunity to supplement the record, as the Eleventh Circuit told Plaintiff he would have the opportunity to do. *See* Opinion (Doc. 116 at 2) ("Because we vacate, Montalban will have the opportunity to supplement the record on remand."). Regardless, insofar as the Court finds herein that Plaintiff has failed to state a claim, the Court has an obligation to do so under 28 U.S.C. § 1915(e)(2)(B) even in the absence of a motion to dismiss.

## II.     Plaintiff's Third Amended Complaint

Plaintiff asserts that on July 15, 2014, when he arrived at the Federal Correctional Complex in Coleman, Florida ("FCC Coleman"), he was seen by Defendant Nikbak.  (Doc. 34 at 9).  Nikbak asked Plaintiff several questions about his health.  *Id.*  Plaintiff told Nikbak that he has suffered pain for almost one-and-one-half years from the "beating" at USP-Canaan,[6] and that he experiences "electric[] shock[]s around [his] head" and pain all over his body.  *Id.*  Nikbak replied that Plaintiff "need[s] to be in population . . . to be diagnosed or consulted," and that he would see Plaintiff "in the population compound."  *Id.*  The two John Doe "S.I.S." officers then approached Plaintiff and began questioning him about the altercation with the officer at USP-Canaan.  *Id.*  Plaintiff told them "several times [he] can't comment" on it and to contact his lawyer.  *Id.* at 10.  According to Plaintiff, in retaliation for not answering their questions, the John Doe officers placed him in the Special Housing Unit (SHU) without an incident report.  *Id.*

Plaintiff was released from the SHU around July 22, 2014.  *Id.* at 14.  That same day, he suffered a collarbone injury and was taken to an outside hospital.  *Id.*; *see also* (Doc. 37 at 3-4).  Upon his return to prison, he saw Nikbak, who reviewed his x-rays.  (Doc. 34 at 14).  Plaintiff asserts that the x-rays revealed his collarbone was broken in three places.  *Id.*  Nikbak provided Plaintiff with two weeks of pain

---

[6] This incident occurred on December 28, 2012.  *See* Doc. 34 at 17, 21; *see also* (Doc. 129-4 at 39-40) (indictment charging Plaintiff with knowingly and intentionally assaulting a BOP employee with a dangerous weapon and possession of a prohibited object stemming from an incident on December 28, 2012 at USP-Canaan).

medication, told Plaintiff that the bone was healing by itself, and Plaintiff could return to his unit. *Id.*

In the days following, Plaintiff saw "several" physician assistants, to whom he explained his medical conditions and his severe pain, but they told him if he continued coming to medical, they would charge him $2.00 for every day they saw him. *See id.* at 15. He argues that if he had been "properly asses[s]ed and diagnosed by [c]ompetent, non-prejudicial or unbiased staff member[s], [his] injuries would have been taken care of and whatever underl[ying] and unseen [i]njuries [he] sustained would also have been diagnosed and treatment would have been provided as well." *Id.* at 17. He remains in "extreme pain" and suffers seizures. *Id.* He claims that Nikbak was deliberately indifferent by not treating Plaintiff's severe pain, by forcing Plaintiff to walk around not knowing when he would have another seizure or electronic shock, and by causing a 5-month delay before Plaintiff was authorized for surgery. *See id.* at 15-16.

According to Plaintiff, on August 28, 2014, he asked Defendant Smith about his legal materials and property, and he told Smith that he needed medical care for his collarbone. *Id.* at 11. Plaintiff alleges that Smith responded, "I [am] wearing this vest for protection just in case you want [to] do . . . something stupid to me," and "just chill it holding the pain." *Id.* Plaintiff claims that Smith denied him "[h]elp[ and m]edical care." *Id.* On that same day, Plaintiff also reported his need for medical care for his collarbone to Defendants Boley and McLean, and these Defendants, along with Smith, advised Plaintiff that he needed to go to health

services to address his medical concerns. *Id.* at 12. Plaintiff asked them for a BP-8 form, but they told him he needed to submit a BP-9 directly to the Warden, which Plaintiff did on August 28, 2014.[7] *Id.* While Plaintiff was waiting for an answer to his BP-9, he asked his "unit team" about his property and legal materials, and McLean told him that he was not going to get anything back because he stabbed a correctional officer in the face. *Id.* at 13. McLean also told Plaintiff to accept the time he got because it was for his own good. *Id.*

At some point, Plaintiff suffered a "seizure" and was sent to health services. *Id.* at 18. He injured his right wrist, but the x-rays confirmed he had no broken bones. *Id.* He was in severe pain, and the following week, he suffered another "seizure" and injured his left wrist. *Id.* at 19. He was sent for x-rays, which revealed "broken bones in . . . left wrist." *Id.* at 20. Sometime thereafter, Plaintiff saw Defendant Tidwell "for follow-up care for [his] injuries."[8] *Id.* Plaintiff claims

---

[7] A copy of this form can be found at (Doc. 129-2 at 12). On that form, Plaintiff requested medical treatment for his collarbone and advised that he was in pain. *Id.* He also stated that his unit team told him he needed to send a BP-9 directly to the Warden. *Id.* Plaintiff appears to allege that he did not receive a response to his BP-9. *See* (Doc. 34 at 12) ("I subm[]itted a[] (BP-9) dated: (8/28/2014) not answer[]s"). As noted *infra*, this BP-9 form was not received by the Warden.

[8] Plaintiff alleges this examination occurred after his clavicle surgery and after his left wrist injury. *See* Doc. 34 at 18. His clavicle surgery was on December 11, 2014, and the left wrist injury occurred around July 4, 2015. *See* (Doc. 138-2 at 13); (Doc. 129-6 at 33).

The medical records attached to the Third Amended Complaint reflect that Defendant Tidwell examined Plaintiff on July 25, 2014. *See* (Doc. 34-2 at 13). During this examination, Tidwell acknowledged that Plaintiff had fractured his left clavicle; he was using a sling, completing three days of Percocet and then would be on Naprosyn for pain control; and he would undergo an x-ray in two weeks. *See id.* Additional records show that on July 29, 2014, Tidwell made the following notation in Plaintiff's medical records: "Pt sustained a clavicular fracture 7/23 was sent to ER and was sent back in sling no paper work has been seen. Xray of L clavicle done today on site shows comminuted clavicular Fx. [O]rtho consult is pending will request this consult be processed." (Doc. 37 at 10).

Plaintiff also submitted medical records in response to the Motion to Dismiss, which the Court summarizes here to provide additional context. Those records reflect that on January 28,

that Tidwell "was extremely pensive and [h]esitant to provide [Plaintiff] with any treatment." *Id.* Tidwell allegedly told Plaintiff, "I know what you are doing and I'm not going to be a part of this [m]atter." *Id.* Plaintiff interprets Tidwell's statement as assuming Plaintiff's legal pursuit was against FCC Coleman's medical and compound staff, which "it is not since they[ a]re not the [i]nitial [m]edical staff responsible for [his] injuries." *Id.* at 20-21. Plaintiff asserts that he told Tidwell that his "seizures" were the result of the correctional officer at USP-Canaan beating Plaintiff on December 28, 2012, and the medical staff's negligence in not treating his injuries. *Id.* at 21-22. Tidwell checked Plaintiff's file and told him that "the medical staff don't [sic] say anything about your problems in your [h]ead" or about seizures. *Id.* at 22. Tidwell also told Plaintiff that he needed to start medication for his seizures, "be convalecient[9] [sic] in [his] unit," and not break any more bones. *Id.* Additionally, Plaintiff alleges that he later learned he needed plastic surgery on his right eye, but faults Tidwell for not telling him earlier. *Id.* at 23.

On April 28, 2016, Plaintiff was injured when he fell from a transport van during a medical trip to a neurological center in Ocala, Florida. *Id.* at 25; (Doc. 34-1 at 3). Tidwell reviewed Plaintiff's x-ray on his left wrist and told Plaintiff that "the [b]one is no[t] healing well, [b]ecause [Plaintiff has a]rthritis in that [b]one and

---

2015, Tidwell saw Plaintiff, noted that he had surgery on his clavicle, he was experiencing post-operative pain, working with physical therapy, and then would be on Naprosyn for pain control. *See* (Doc. 138-2 at 9). On August 20, 2015, Tidwell evaluated Plaintiff and noted, in part: "Fracture of L clavic[le], pt had ORIF [(open reduction and internal fixation)] 12/11/14 has pain which is better than before the surgery[;] on [N]aprosyn for pain control. [H]as fracture of L wrist – is in cast and followed by ortho." (Doc. 138-2 at 13).

[9] The Court assumes Plaintiff is referring to "convalescence" status, which is a status used to restrict an inmate's activities for health reasons. *See* (Doc. 37 at 20) (defining "convalescence").

[ha]s [an] old fracture." Doc. 34 at 26. Plaintiff alleges "they" told him there was nothing that could be done other than to provide pain medication. *Id*. at 27. He concludes that Tidwell delayed his medical treatment. *See id*.

Regarding Defendant Phillips, Plaintiff claims that he advised Phillips "several times" that he was not timely receiving his legal and regular mail, and Phillips told him that it is a mailroom issue. *Id*. at 28-29. Plaintiff asked Phillips for a BP-8 form and explained that he had a civil case (case no. 5:15-cv-635-Oc-10PRL[10]) in Federal Court and "the Legal Mail don't [a]rrive[] in time." *Id*. at 28. Plaintiff was in Phillips' office when Phillips told Plaintiff "to start looking for another unit, [b]ecause[ Plaintiff] put in some rocks in his shoes," and then Phillips "slamm[ed] the desk, hard to try to scar[e]" Plaintiff. *Id*. at 29. Plaintiff left Phillips' office and proceeded to tell the doctor in charge of the unit Challenge Program everything that happened. *Id*.

In June 2016, Plaintiff submitted several BP-8 forms complaining about Phillips. *Id*. at 30. On June 20, 2016 (the same day Plaintiff initiated this case), Phillips "scream[ed]" Plaintiff's name, stated he had legal mail, and directed Plaintiff to come to his office. *Id*. At that time, Plaintiff realized "they"[11] had his legal and regular mail, and he suffered "harm, pain" as a result of his unit team "rejecting, refusing, los[ing], withholding, tampering with" and interfering with his

---

[10] Plaintiff filed case no. 5:15-cv-635-Oc-10PRL in this Court on December 21, 2015; it was dismissed on April 26, 2016; and the Court denied Plaintiff's request for reconsideration on October 21, 2016. *See* Docket, case no. 5:15-cv-635-Oc-10PRL (M.D. Fla.).

[11] Plaintiff clarifies in his Response that "they" refers to Phillips and Heuett. *See* (Doc. 129-4 at 5).

"access to [l]egal [l]aw, or get[ting] any [m]aterials deemed necessary for [his l]egal

pursuit." *Id.* at 30-31.  According to Plaintiff, Phillips and Heuett interfered,

obstructed, and conspired to confiscate his legal documents from this Court, as well

as his administrative remedy responses from the regional and central offices.  *Id.* at

31.  As a consequence, Plaintiff asserts that his civil case (case no. 5:15-cv-635-Oc-

10PRL) was dismissed.  *Id.*  Plaintiff concludes that Phillips and Heuett were

deliberately indifferent to his serious medical needs by denying him medical care.[12]

*Id.* at 32.

### III.    Motion to Dismiss Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007)); *Bilal v. Geo Care, LLC*, 981 F.3d 903, 911 (11th Cir. 2020)

("[O]n a Rule 12(b)(6) motion, we accept the factual allegations in the complaint as

true and construe them in the light most favorable to the plaintiff." (internal

quotations and citation omitted)).  "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing

*Twombly*, 550 U.S. at 556).  "Labels and conclusions" or "a formulaic recitation of

the elements of a cause of action" that amount to "naked assertions" will not do.  *Id.*

---

[12] It is unclear whether this conclusion applies to Phillips and Heuett or just Phillips; but liberally
construing Plaintiff's allegations, the Court assumes it applies to both Defendants.

(quotations, alteration, and citation omitted).  Moreover, a complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001) (quotations and citations omitted).  The Court liberally construes a pro se plaintiff's allegations.  *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Bingham v. Thomas*, 654 F.3d 1171, 1175 (11th Cir. 2011).

### IV.   Exhaustion of Administrative Remedies

a.   Parties' Positions Regarding Exhaustion

Defendants detail the administrative remedies that Plaintiff submitted during the relevant timeframe, as well as his "frequent communication with Bureau staff." (Doc. 124 at 8-14).  According to Defendants, "[P]laintiff was able to file eight administrative remedies between his arrival at FCC Coleman and the date he filed his initial complaint."  *Id*. at 14.  They further contend that "[P]laintiff's submitted documents also show he was able to communicate with Bureau staff via email, written requests to staff, informal administrative remedy requests, the filing of formal administrative remedies, and general correspondence on more than thirty (30) occasions."  *Id*.  Defendants argue that considering the facts and supporting documentation, "there is no credible evidence [P]laintiff was deterred from filing or pursuing proper exhaustion of his administrative remedies, nor is there any evidence that actions of BOP staff would have deterred a reasonable inmate from filing or pursuing proper exhaustion."  *Id*. at 15.  Defendants contend that Plaintiff's

failure to exhaust is of his own doing and request that the Court dismiss the case on that basis. *Id.*

Defendants attached to the Motion to Dismiss the Declaration and Certification of Records by Kenneth Lee Richardson, Agency Counsel for the BOP at FCC Coleman. (Doc. 124 at 26-45). Richardson avers in pertinent part:

> Computerized administrative remedy records maintained by the Bureau reveal inmate Montalban has filed eight (8) administrative remedies since his arrival at FCC Coleman on July 17, 2014, and the filing of his initial complaint on June 20, 2016. . . .

> Specifically, on October 26, 2015, inmate Montalban filed administrative remedy 840409-F1 alleging that he had an unresolved medical issue with his left shoulder and that the BOP had allegedly lost his personal property or legal documents. This remedy was rejected on October 28, 2015. The rejection codes indicate that the remedy was rejected because the inmate raised more than one issue when he is only allowed to raise one issue per remedy ("MLT"). It was also rejected because the inmate failed to provide specific information as to his allegations and how it related to his confinement ("MSI"), and he was told he could resubmit his request in proper format within five (5) days of the rejection notice ("RSF").

> On November 5, 2015, inmate Montalban filed remedy number 840409-F2. From the record, it appears he provided additional information indicating the issue he sought relief from occurred in July 2014. This resubmitted remedy was then rejected as untimely ("UTF"). BOP policy states that an inmate has twenty (20) days from the date of the incident to file his remedy and he failed to do so. It appears that the remedy was filed untimely, even if you relate the date back to the original date he filed the initial remedy. The inmate never filed an appeal to the Region or to the Central Office.

> On January 15, 2016, inmate Montalban filed remedy numbers 849260-R1, and 849264-R1 with the

Northeast Regional Office. Each of these remedies were rejected on January 22, 2016. Inmate Montalban was informed these remedies were submitted in the wrong region and needed to be resubmitted in the correct Region. There is no record that he resubmitted these remedies in the appropriate region. . . .

On January 19, 2016, inmate Montalban filed remedies 848746-R1, denial of his property and 848748-R[1], staff assault. Both with the Southeast Region. Both remedies were rejected by the Southeast Regional office on January 19, 2016. The reason given for the rejection was that neither issue raised was a sensitive issue as alleged.

The Inmate filed remedies 848746-A1 and 848748-A1 with the BOP at the Central Office on April 25, 2016. Inmate Montalban alleged that he . . . was denied his property. The remedies were both rejected on May 10, 2016, because the remedies were filed at the wrong level based on the allegations made, and he was to follow the directions he was previously given in previous rejection notices.

There is no evidence Plaintiff followed the instructions and refiled remedies 848746 or 848748.

. . . .

Pursuant to Policy the BOP does not keep copies of rejected administrative remedies.

(Doc. 144 at 27-28) (paragraph enumeration and internal citations omitted).

Richardson attached the pertinent records to his Declaration. *See id*. at 30-45.

Defendants also submitted the Declaration of Defendant Phillips with attachments. *Id*. at 47-105. Phillips avers in pertinent part:

In reviewing the records provided by the Inmate, and my own personal recollection, I do remember him accusing myself and the unit team of improperly withholding his mail. As a result, we began a process

where Inmate Montalban would sign for his mail each time. This is generally required for legal mail, but we started doing this process for all the mail Inmate Montalban received so as to have a record of his receiving or refusing his mail.

There is a specific accusation that at some point prior to June 2016, I improperly handled his mail. He says that there was a plain manila envelope with his name on it that was already opened. These allegations are not true.

In reviewing the Inmate Legal/Certified mail log that the Unit team kept at the time, it appears the envelope arrived on the morning of May 26, 2016.

The envelope in question had Inmate Montalban's name, registration number, and unit on the front. Additionally, the envelope also included the FCC Coleman address indicating this was an envelope used by staff to distribute correspondence to staff and, at times inmates.

At approximately 1:55 P.M., I tried to deliver the envelope to Inmate Montalban, but he refused. I had him sign the log indicating his refusal.

His signature on May 26, 2016, is similar to the signature on June 20, 2016, where he received mail from the Third Circuit Court of Appeals.

I retained the envelope and the contents, dated it and signed it indicating Inmate Montalban refused to accept the mail. Plaintiff still has not asked for the documents.

Inside the envelope were Central Office Rejection notices dated May 10, 2016. One notice was for administrative remedy #848746-A1. . . . Also included in the envelope was the rejection notice for the administrative remedy #848748-A1.

I reviewed Document 34-1, pgs. 20-23. These pages are administrative remedy claims in which the Inmate complained that he refused to accept his mail, because it

> was already opened. However, it is BOP policy that mail
> that is not labeled as legal mail, will be opened and
> inspected before delivery to an inmate.

*Id.* at 47-48 (paragraph enumeration and internal citations omitted).

In Plaintiff's Response, he appears to argue that this Court cannot consider documents outside of the pleadings without converting a motion to dismiss into a motion for summary judgment. *See* (Doc. 129 at 8). He requests that the parties be afforded the opportunity to "conduct limited discovery" to ascertain whether the administrative remedy process was available to him in light of his allegation "that prison[] officials would not provide[] him grievance[] forms." *Id.* at 15 (capitalization omitted). He further asserts that allowing limited discovery would permit him "to submit 'evidence' pertaining to his clai[ms] that prison[] officials [ ]thwarted, impeded, denied, obstructed, [and] confiscated the administrative remedies." *Id.* (capitalization omitted).[13]

Substantively, as to exhaustion Plaintiff asserts that he was "threatened to stop pursuing all administrative remedies, that he was told that he would not [be] receiving responses to his grievances, and that Coleman staff often . . . refused to provide [Plaintiff] with the required forms." *Id.* at 38 (internal quotations and

---

[13] Plaintiff refers to a "log book" and declarations of staff members from the Southeast Regional Office, but otherwise does not explain what evidence he seeks to discover or how the log book or staff declarations would help him. (Doc. 132 at 1). Plaintiff's argument that Mr. Richardson did not submit the Southeast Regional Office's rejection notices, rending it impossible to know if Plaintiff could appeal those rejections, *see* (Doc. 138 at 10), is of no moment because Plaintiff did appeal the remedies submitted to that Region. Additionally, Plaintiff seeks to submit copies of his emails sent in May and June 2016 to refute Phillips' Declaration *see* (Doc. 136 at 5), but it is unclear how these emails would affect the exhaustion arguments. Regardless, Plaintiff's request for discovery is futile because the Court alternatively finds that the case is due to be dismissed for failure to state a claim, so discovery on exhaustion or the merits is not warranted.

capitalization omitted); *see* (Doc. 34 at 8) (alleging that since Plaintiff was involved in a violent incident with a correctional officer at USP-Canaan, he has been threatened "to stop all actions against (FBOP) staff in the form of Administrative Remedies, [and] Request[s] for [his] [l]egal [m]aterials that have been lost or [d]amage[d] or stolen by either the USP-C[anaan] or USP-Coleman"). He asserts that Defendant Phillips "denied the administrative remedies and including that the [tort action form-95] . . . to initiate[] the process in the Southeast Regional Office, against the staff members at [FCC Coleman]." (Doc. 129 at 21) (capitalization omitted). According to Plaintiff, this occurred in June or July 2016, "and this action deterred [him from] . . . continu[ing] in the next level, before [he] proceed[ed] to the U.S. Dist[rict] Court." *Id.* (capitalization omitted). Additionally, Plaintiff contends that Defendant Phillips presented "fraudulent" mail logs to the Court and his declaration is "not accurate." *See id.* at 35-37.

Plaintiff also argues that Defendant McLean "waited until after the deadline lapsed to provide [him] with the informal resolution form," thus rendering his administrative remedy untimely. *Id.* at 28 (capitalization omitted). Specifically, he alleges that he requested a BP-8 form when he arrived at FCC Coleman in July 2014 but McLean denied him a form, and Plaintiff "requested again when [he] was in bet[t]er conditions" in October 2015, after recovering from his clavicle and left wrist injuries. *Id.* (capitalization omitted); *see also id.* at 32 (recognizing that in October 2015, he "started again the process of the administrative remedies with" McLean).

Plaintiff further alleges that he was "phys[i]cally incapable" of preparing administrative remedies from July 2014 through December 2014, as well as part of 2015, because he was recovering from surgery on his left clavicle and he suffered another injury to his left wrist.  *Id.* at 32 (capitalization omitted).  He asserts that he needed to wait until he fully recovered, which occurred in October 2015, to "start[] again" the administrative remedy process.  *Id.* (capitalization omitted); *see id.* at 33 (arguing that "administrative remedies were []rendered unavailable because[] his injuries prevented him from filing a timely request" (capitalization omitted)).

> b.  Exhaustion Analysis

An inmate must first exhaust all available administrative remedies before filing any claim under *Bivens*.  *See* 42 U.S.C. § 1997e(a).  But a prisoner is not required to plead exhaustion.  *See Jones v. Bock*, 549 U.S. 199, 216 (2007).  Instead, "failure to exhaust is an affirmative defense under the [Prison Litigation Reform Act (PLRA).]"  *Id.*  The defendant carries the burden of showing a failure to exhaust. *Id.* at 212.  Notably, exhaustion of available administrative remedies is "a precondition to an adjudication on the merits" and is mandatory under the PLRA. *Bryant v. Rich*, 530 F.3d 1368, 1374 (11th Cir. 2008).  Not only is there an exhaustion requirement, "the PLRA exhaustion requirement requires proper exhaustion."  *Woodford v. Ngo*, 548 U.S. 81, 93 (2006).

> Because exhaustion requirements are designed to deal
> with parties who do not want to exhaust, administrative
> law creates an incentive for these parties to do what they
> would otherwise prefer not to do, namely, to give the

> agency a fair and full opportunity to adjudicate their
> claims. Administrative law does this by requiring proper
> exhaustion of administrative remedies, which "means
> using all steps that the agency holds out, and doing so
> properly (so that the agency addresses the issues on the
> merits)." Pozo,[14] 286 F.3d, at 1024. . . .

*Woodford*, 548 U.S. at 90.  And "[p]roper exhaustion demands compliance with an

agency's deadlines and other critical procedural rules[.]"  *Id.*

> Courts may not engraft an unwritten "special
> circumstances" exception onto the PLRA's exhaustion
> requirement. The only limit to § 1997e(a)'s mandate is the
> one baked into its text: An inmate need exhaust only such
> administrative remedies as are "available."

*Ross v. Blake*, 136 S.Ct. 1850, 1862 (2016).

The determination of whether an inmate has properly exhausted his

available administrative remedies is a matter of abatement and should be raised in

a motion to dismiss or be treated as such if raised in a summary judgment motion.

*Bryant*, 530 F.3d at 1374-75 (citation omitted).  The Eleventh Circuit has explained

the two-step process that this Court must employ when examining the issue of

exhaustion.

> In *Turner v. Burnside*[15] we established a two-step
> process for resolving motions to dismiss prisoner lawsuits
> for failure to exhaust.  541 F.3d at 1082.  First, district
> courts look to the factual allegations in the motion to
> dismiss and those in the prisoner's response and accept
> the prisoner's view of the facts as true.  The court should
> dismiss if the facts as stated by the prisoner show a
> failure to exhaust.  *Id.*  Second, if dismissal is not
> warranted on the prisoner's view of the facts, the court
> makes specific findings to resolve disputes of fact, and

---

[14] *Pozo v. McCaughtry*, 286 F.3d 1022 (7th Cir. 2002).

[15] *Turner v. Burnside*, 541 F.3d 1077, 1084 (11th Cir. 2008).

> should dismiss if, based on those findings, defendants
> have shown a failure to exhaust.  *Id.* at 1082-83; *see also*
> *id.* at 1082 (explaining that defendants bear the burden of
> showing a failure to exhaust).

*Whatley v. Warden, Ware State Prison*, 802 F.3d 1205, 1209 (11th Cir. 2015).

The BOP provides an internal administrative remedy procedure for its inmates.  *See* 28 C.F.R. § 542.10, et seq.  Generally, a prisoner must complete a three-step sequential process if the informal resolution procedures fail to resolve the issue.[16]  As to the formal administrative remedy procedures, an inmate first must submit a Request for Administrative Remedy on the BP-9 form to the Warden within twenty days of the incident.  *See* 28 C.F.R. § 542.14(a).  If the inmate is not satisfied with the Warden's response, he may submit an appeal on the BP-10 form to the Regional Director within twenty days of the Warden's response.  *See* 28 C.F.R. § 542.15(a).  If the inmate is dissatisfied with the Regional Director's response, he may submit an appeal on the BP-11 form to the General Counsel within thirty days of the Regional Director's response.  *See id.*

Here, at the first step of the exhaustion analysis, taking Plaintiff's assertions as true, the Court finds dismissal is not warranted.  At the second step of the *Turner* process, the Court resolves any factual disputes and Plaintiff's assertions that the process was unavailable to him.[17]  To do so, the Court first summarizes the relevant administrative remedies Plaintiff submitted.

---

[16] A federal inmate must "first present an issue of concern informally to staff" who must "attempt to informally resolve the issue before an inmate submits a Request for Administrative Remedy."  *See* 28 C.F.R. § 542.13(a).

[17] Insofar as Plaintiff argues that the Court cannot consider matters outside of the pleadings without converting Defendants' Motion into one for summary judgment, the Eleventh Circuit has held

Administrative Remedies #840409-F1 and #840409-F2

On October 23, 2015, Plaintiff authored remedy #840409-F1, asking about his "property, legal documents from [his] case." (Doc. 124 at 37) (capitalization omitted); see id. at 31. He also claimed to have "suffer[ed] an injury in [his] left clavic[le]" on July 22, 2014. *Id*. (capitalization omitted). The BOP received Plaintiff's remedy on October 26, 2015. Id. at 36. On October 28, 2015, the BOP rejected the administrative remedy because Plaintiff listed more than one issue and he failed to provide specific information about his request. *Id*. He was advised that he could resubmit his request within five days from the date of the rejection notice. *Id*.

On November 2, 2015, Plaintiff wrote remedy #840409-F2 regarding his legal documents. *Id*. at 42; *see id*. at 31. He further stated that two U.S. Marshals transported him in July 2014 from a county jail to USP-Canaan with his legal documents, and he had been requesting that his counselor find his property since he arrived on B-Unit at FCC Coleman. *Id*. at 42. The BOP received Plaintiff's remedy on November 5, 2015, and rejected it as untimely, because such requests must be made within 20 days of the event complained about. *Id*. at 41. Although permitted

---

otherwise. Indeed, to make findings regarding exhaustion, "courts should treat the question of exhaustion as a matter in abatement and look outside the pleadings to make factual findings." *Jenkins v. Sloan*, 826 F. App'x 833, 838-39 (11th Cir. 2020) (citing *Bryant*, 530 F.3d at 1376 ("Where exhaustion—like jurisdiction, venue, and service of process—is treated as a matter in abatement and not an adjudication on the merits, it is proper for a judge to consider facts outside of the pleadings and to resolve factual disputes so long as the factual disputes do not decide the merits and the parties have sufficient opportunity to develop a record.")). Thus, the Court properly considers matters outside of the pleadings to make factual findings regarding exhaustion.

to do so, there is no record of Plaintiff appealing this rejection to the Region or Central Office.

### Administrative Remedies #849260-R1 and #849264-R1

On January 15, 2016, the Northeast Regional Office received remedy #849260-R1 regarding staff misconduct.  (Doc. 124 at 32).  The remedy was rejected on January 22, 2016, because it was submitted to the wrong region.  *See id.*; *see also id.* at 27-28.  Plaintiff was advised that he "must file in the region [he was] housed in, as [he] claim[ed] a sensitive issue."  *Id.* at 32 (capitalization omitted).

The Northeast Regional Office also received administrative remedy #849264-R1 on January 15, 2016, regarding a request for medical treatment.  *Id.*  That remedy was rejected for the same reason, and Plaintiff was directed to "resubmit [his] appeal to the southeast regional office."  *Id.* (capitalization omitted); *see also id.* at 90.

### Administrative Remedies #848746-R1 and #848746-A1

The Southeast Regional Office received administrative remedy #848746-R1 on January 19, 2016, in which Plaintiff alleged a "denial of property."  *Id.* at 33 (capitalization omitted).  The remedy was rejected on that same day, because the issue raised was not a sensitive issue.  *Id.*; *see id.* at 28.  Plaintiff submitted an appeal (#848746-A1) dated April 15, 2016.  *See id.* at 58.  In his appeal, he stated that he filed a "sensitive BP-10" with both the Northeast and Southeast Regional Offices on January 4, 2016, pertaining to his "personal and legal property and staff's deliberate indifference and their acts of retaliation in attempting to request them"

19

but he did not receive any responses.  *Id*.  The Central Office received the appeal on April 25, 2016, and rejected it on May 10, 2016, because it was submitted to the wrong office and Plaintiff was told to follow the directions previously provided to him on prior rejection notices.  *See id*. at 34; *see also id*. at 28, 57.

<u>Administrative Remedies #848748-R1 and #848748-A1</u>

The Southeast Regional Office received administrative remedy #848748-R1 on January 19, 2016, in which Plaintiff alleged staff assault.[18]  *Id*. at 33.  The remedy was rejected the same day because the issue raised was not a sensitive issue as Plaintiff alleged.  *Id*.; *see also id*. at 28.  On April 25, 2016, the Central Office received remedy #848748-A1, in which Plaintiff stated that he had filed a sensitive BP-10 form with both the Northeast and Southeast Regional Offices relating to "medical issues [he] endured during the severe physical beatings [he] received from USP Canaan's staff . . . on December 28, 2012."  *Id*. at 89.  He claimed to have "sustained numerous injuries that were NEVER treated and [he] had developed seizures that have created more injuries to [his] person (broken wrist bones [untreated] and a broken collar bone [treated]) after these beatings by staff."  *Id*.  He requested the relief he outlined in his BP-10 form and "disciplinary actions taken against the staff members involved."  *Id*.  On May 10, 2016, the Central Office

---

[18] Plaintiff acknowledges that he submitted duplicate remedies to the Northeast and Southeast Regional Offices.  *See* (Doc. 124 at 71); (Doc. 129-2 at 5); (Doc. 129-3 at 2); (Doc. 128 at 8).  Based on the dates submitted, it appears that remedy #849260-R1 and remedy #848748-R1 are duplicative.

rejected the remedy for being submitted at the wrong level, and Plaintiff was advised to follow the directions previously provided.  *See id*. at 34, 88.

In addition to the above administrative remedies, prior to filing this case, Plaintiff sent emails regarding his collarbone injury on July 30, 2014 and August 25, 2014.  *See* (Doc. 37 at 13, 14).[19]  Plaintiff also wrote inmate requests on October 14, 2015; October 22, 2015; November 4, 2015; November 7, 2015; December 3, 2015; January 4, 2016; May 5, 2016; June 9, 2016;[20] and June 13, 2016.  *See* (Doc. 34-1 at 6, 15, 23, 48, 49, 56); (Doc. 124 at 75, 79, 83).  He drafted informal resolution forms on August 28, 2014; October 23, 2015; and June 10, 2016 (two forms).  *See* (Doc. 34-1 at 16, 21, 58); (Doc. 124 at 39).  And he also submitted a Tort Claim on January 4, 2016.  *See* (Doc. 34-1 at 29).

While Plaintiff submitted a number of administrative remedies at various levels, the record shows that Plaintiff did not properly proceed through the entire administrative process with respect to any of the issues raised in his Third Amended Complaint.  By not properly completing the administrative process, he

---

[19] On April 10, 2017, Plaintiff filed a motion seeking to supplement the Third Amended Complaint.  *See* (Doc. 51).  The Court denied Plaintiff's request because the supplement would amount to another amendment, and good cause did not exist at that time to add numerous pages of medical records to the operative complaint.  *See* Order (Doc. 53).  For purposes of exhaustion, however, the Court has reviewed the entire file and notes that between September 24, 2014 and April 11, 2015, Plaintiff sent nine emails regarding his collarbone injury, surgery date, post-surgery pain, and medication refills.  *See* (Doc. 51 at 4-12).  Plaintiff was repeatedly advised to report to sick call. *See id*.

[20] In his handwritten June 9, 2016 inmate request, Plaintiff acknowledged that two weeks prior (May 26, 2016), his counselor told him that he had legal mail and needed to sign for the envelope.  *See* (Doc. 34-1 at 23).  Plaintiff, however, told his counselor that the envelope was already open with no name on the front of the envelope.  *See id*.  Plaintiff requested information on who sent the envelope.  *See id*.  The response dated June 16, 2016 says, "See attached." *Id*.  The details in Plaintiff's request coincide with the incident described in Phillips' Declaration. *See* (Doc. 124 at 47-48).

failed to exhaust his administrative remedies prior to filing this case.  *See Woodford*, 548 U.S. at 90-91.

Plaintiff claims, however, that the process was unavailable to him, because he was "threatened[] to stop pursuing all administrative remedies, . . . told that he would not receiv[e] responses[] to his grievances, and . . . Coleman staff []often . . . refused to provide [Plaintiff] with the required forms."  (Doc. 129 at 38) (capitalization omitted).  The Supreme Court has delineated three circumstances that may render administrative remedies unavailable:

> (1) when the administrative procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes... incapable of use... [and] no ordinary prisoner can discern or navigate it"; and (3) when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Geter v. Baldwin State Prison*, 974 F.3d 1348, 1355 (11th Cir. 2020) (quoting *Ross*, 136 S.Ct. at 1859-60).  The Eleventh Circuit has held:

> [A] prison official's serious threats of substantial retaliation against an inmate for lodging or pursuing in good faith a grievance make the administrative remedy "unavailable," and thus lift the exhaustion requirement as to the affected parts of the process if both of these conditions are met: (1) the threat actually did deter the plaintiff inmate from lodging a grievance or pursuing a particular part of the process; and (2) the threat is one that would deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance or pursuing the part of the grievance process that the inmate failed to exhaust.

*Turner*, 541 F.3d at 1085.

Initially, the Court notes that for the most part, Plaintiff's assertions regarding being "threatened to stop pursuing all administrative remedies," told that he would not be receiving responses, and denied forms are vague and conclusory. While he explains some of the "threats," "retaliation," and other actions of the Defendants, which the Court addresses below, Plaintiff generally fails to provide details of when these actions occurred, who threatened him, what the threats were, or how (in light of the alleged threats) he was still able to engage in the administrative process and informally communicate with BOP staff at certain points.

The more specific threats, retaliation, and actions that Plaintiff alleges are as follows.  Plaintiff alleges that he was retaliated against by the John Doe officers and placed in the SHU for not answering their questions; while he was waiting for a response to his August 28, 2014 BP-9 form, he asked McLean about his property and legal materials and McLean told him that he was not getting any property back; Phillips told Plaintiff to start looking for another unit and slammed his desk to scare Plaintiff; Phillips denied Plaintiff's request for administrative remedy forms and refused to file any of his administrative remedies; and McLean waited until after the deadline lapsed to provide Plaintiff with a BP-8 form in July 2014, and failed to actually file his two administrative remedies on August 28, 2014. Plaintiff also seemingly asserts that he waited until October 2015 when he recovered from his injuries to ask McLean about the formal administrative remedy process, because McLean told him to wait until the investigation into his missing

property concluded and until he recuperated from his injuries.  *See* (Doc. 129-2 at 1); *see also* (Doc. 129 at 32); (Doc. 138 at 17-18, 20-21).

Even accepting Plaintiff's allegations as true, these alleged threats and actions did not render the administrative process unavailable to Plaintiff.  Plaintiff does not allege that the retaliation by the John Doe officers or McLean's statement to him about not getting his property back actually deterred him from engaging in the administrative remedy process.  The incident with the John Doe officers happened around July 15, 2014, and based on the allegations in the Third Amended Complaint, the incident with McLean telling Plaintiff he was not getting his property back occurred while Plaintiff was waiting for a response to his August 28, 2014 remedy.  *See* (Doc. 34 at 13).  Thereafter, Plaintiff repeatedly inquired about his property.  *See* (Doc. 129-2 at 24) (inmate request dated November 4, 2015); *id*. at 25 (administrative remedy dated November 2, 2015); *id*. at 27 (informal resolution dated October 23, 2015); *id*. at 28 (inmate request dated October 22, 2015); *id*. at 29 (administrative remedy dated October 23, 2015); *id*. at 31 (inmate request dated October 13, 2015).

The specific "threat" from Phillips—slamming his desk and telling Plaintiff to look for another unit—appears to have occurred between May 26, 2016 and June 30, 2016.  *See* (Doc. 129-3 at 13-14) (email from Plaintiff to the Warden dated June 30, 2016, advising of Defendant Phillips' actions and stating that the issues began on May 26, 2016).  Plaintiff acknowledges that he immediately left Phillips' office and went to Dr. Maurize, who was in charge of the unit Challenge Program, and told

24

him everything that happened.  Plaintiff also emailed the Warden about Phillips'
threat and submitted several BP-8 complaints about Phillips in June 2016.  *See*
(Doc. 34 at 30).  Plaintiff's actions suggest that he was not deterred by this threat.
Moreover, the threat was unrelated to the administrative remedy process.  Indeed,
Plaintiff asserts that Phillips told him to start looking for another unit because
Plaintiff put "some rocks in his shoes."  *Id*. at 29.  More importantly, Plaintiff filed
this case on June 20, 2016.  Therefore, that specific threat could not have prevented
Plaintiff from filing administrative remedies prior to that incident.

Additionally, Plaintiff fails to provide much detail or context about being
denied forms.  At one point in his Response he states that Phillips "denied the
administrative remedies" and Plaintiff's Tort Claim in June or July 2016, "and this
action deterred" him from continuing on to the next level.  (Doc. 129 at 21)
(capitalization omitted).  Nevertheless, any actions taken after Plaintiff filed the
initial complaint in this case are irrelevant to the issue of exhaustion.

Plaintiff does allege that McLean denied him a BP-8 form in July 2014 and
misled Plaintiff by telling him that he needed to check about his property every day
and could start the administrative process after he recuperated from his injuries.
*See* (Doc. 129-2 at 1, 4); (Doc. 138 at 17-18, 20-21).  Even assuming those assertions
are true, Plaintiff clearly was not continually denied forms, as he was able to
submit multiple administrative remedies prior to June 2016.  Moreover, such
allegations may hold weight if Plaintiff had completed the three-step process and
his administrative remedies were rejected as untimely.  However, the only remedy

that was rejected as untimely was remedy #840409-F2.  Plaintiff submitted that remedy on November 5, 2015, complaining about his property being lost during his transfer in July 2014.  Inmates are required to file a remedy within 20 days of an incident; thus, because Plaintiff filed this remedy more than 1 year after his property was lost, the remedy was rejected as untimely.[21]  Regardless, Plaintiff still had the opportunity to appeal that decision, but he did not do so.

Finally, Plaintiff seems to acknowledge that he did not request forms between August 2014 and October 2015 because of his physical injuries.  *See id.* at 28 (arguing that McLean denied him a BP-8 form in July 2014 when he asked to start the administrative process, and Plaintiff "started to proceed to request[] to [McLean] about the formal administrative remedy process" in October 2015 after he recuperated from his injuries); *id.* at 32 (stating in October 2015, when Plaintiff was recuperated from his injuries, he "started again the process of the administrative remedies with the Counselor at B-unit with [McLean]").  So his lack of filing between July 2014 and October 2015 was not based on threats or inability to obtain forms, but rather his alleged physical ailments.

Indeed, Plaintiff argues that he was physically unable to submit administrative remedies from July 2014 through December 2014, as well as part of 2015, due to his medical conditions.  It is unclear whether Plaintiff means he could not physically write during this time, but his submissions refute such an assertion.

---

[21] The individuals who transported Plaintiff and allegedly lost his property are not defendants in this case, and staff at FCC Coleman contacted USP-Canaan in an attempt to locate Plaintiff's missing property.

He authored an informal resolution on August 28, 2014, seeking medical care for his collarbone.  *See* (Doc. 34-1 at 58).  That same day, he also authored an administrative remedy directed to the Warden regarding his need for medical care for his collarbone.  *See id*. at 57.[22]  Similar to the allegations in his Third Amended Complaint, Plaintiff states in the remedy that his unit team advised him to send a BP-9 directly to the Warden.  *See id*.  Between September 24, 2014 and April 11, 2015, Plaintiff sent nine emails.  *See* (Doc. 51 at 4-12).  Based on the filings, the Court is not convinced that Plaintiff was physically incapable of submitting administrative remedies during the timeframe he alleges.

Plaintiff also argues that he could not properly exhaust because he did not receive responses to a multitude of administrative remedies.  Even if he did not receive responses, however, the administrative process requires him to proceed to the next level.  *See* 28 C.F.R. § 542.18 ("If the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level.").  Plaintiff does not allege that he was unaware of this requirement.  Indeed, by at least April 15, 2016, Plaintiff was aware that he needed to proceed to the next level if he did not timely receive a response.  *See* (Doc. 37 at 32); *see also* (Doc. 129-3 at 15).  Thus, assuming Plaintiff did not receive responses to his administrative remedies, he could have and was required to continue on to the next level.[23]

---

[22] This administrative remedy is not listed on the BOP's printout of received remedies, so it seems that it was never received by the Warden, which explains why Plaintiff says he never received a response.

[23] Plaintiff repeatedly concludes that he did not receive responses, but then he details a timeline of

As outlined above, Plaintiff engaged in the administrative remedy process at various steps and with various offices.  He just did so improperly and thus, he failed to exhaust his administrative remedies prior to filing this case.  Even taking Plaintiff's allegations as true, he has not alleged a serious threat of substantial retaliation which actually deterred him from lodging an administrative remedy or that would deter a reasonable inmate from lodging one.  He likewise has not shown that the administrative process was otherwise unavailable to him under the three circumstances delineated in *Ross*.  Regardless, as explained below, even assuming the administrative remedies were unavailable to Plaintiff, he has failed to state a claim and this case is due to be dismissed.

## V.    Alternative Analysis on Substantive Claims

Defendants alternatively argue that Plaintiff does not have a cause of action pursuant to *Bivens* for the alleged violations of his First, Fifth, Sixth, or Fourteenth Amendment rights; and Defendants are entitled to qualified immunity for Plaintiff's claims under the Eighth Amendment because Plaintiff has failed to state a claim.

### a.    Extension of Bivens Claims

In 1971, the Supreme Court recognized an implied cause of action for damages against federal officials who violate an individual's Fourth Amendment rights against unreasonable search and seizures.  *Bivens*, 403 U.S. at 389, 397.  A *Bivens* action is meant to have a deterrent effect on federal actors, so the

---

his administrative remedies and responses, indicating the dates on which he submitted the remedies and the dates he received responses.  *See* (Doc. 129-3 at 7-8).  Given Plaintiff's contradictory allegations, it is unclear whether or not Plaintiff timely received responses.

appropriate remedy is damages rather than injunctive relief.  *See Carlson v. Green*,

446 U.S. 14, 21 (1980). Since 1971, the Court has extended *Bivens* on only two

occasions.

> In *Davis v. Passman*, 442 U.S. 228 (1979), an
> administrative assistant sued a Congressman for firing
> her because she was a woman. The Court held that the
> Fifth Amendment Due Process Clause gave her a
> damages remedy for gender discrimination. Id. at 248-49.
> And in *Carlson v. Green*, 446 U.S. 14 (1980), a prisoner's
> estate sued federal jailers for failing to treat the
> prisoner's asthma. The Court held that the Eighth
> Amendment Cruel and Unusual Punishments Clause
> gave him a damages remedy for failure to provide
> adequate medical treatment. *See id.* at 19. These three
> cases—*Bivens*, *Davis*, and *Carlson*—represent the only
> instances in which the Court has approved of an implied
> damages remedy under the Constitution itself.

*Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854-55 (2017) (internal citations modified); *see*

*Johnson v. Burden*, 781 F. App'x 833, 836 (11th Cir. July 9, 2019) ("*Bivens* has been

applied to a Fourth Amendment case involving a search and seizure, a Fifth

Amendment gender discrimination case, and an Eighth Amendment case involving

cruel and unusual punishment.  Only in these three contexts did the Supreme Court

approve an implied damages remedy under the Constitution itself." (citations

omitted)).[24]

---

[24] The Supreme Court has expressly declined to extend *Bivens* remedies in multiple contexts.  *See Reichle v. Howards,* 566 U.S. 658, 663 n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims."); *Minneci v. Pollard*, 565 U.S. 118, 124 (2012) (describing the contexts in which the Court has declined to extend a *Bivens* remedy); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001) ("Since *Carlson* we have consistently refused to extend *Bivens* liability to any new context or new category of defendants.").  Lower courts have likewise declined to extend *Bivens*.  *See Oliva v. Nivar*, 973 F.3d 438, 442 (5th Cir. 2020) (reversing the district court's extension of the *Bivens* remedy to a Fourth Amendment excessive-use-of-force claim); *Taylor v. Lockett*, No. 5:17-cv-23-Oc-02PRL, 2019 WL 764023, at *7 (M.D. Fla. Feb. 21, 2019) (declining to extend *Bivens* remedy to the

In 2017, the Supreme Court decided *Abbasi*.  The Court recognized that it "has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Abbasi*, 137 S. Ct. at 1857 (quoting *Iqbal*, 556 U.S. at 675).  To determine whether a *Bivens* remedy exists, a court first asks whether the case before it presents a new *Bivens* context, which requires a court to consider whether "the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court." *Id*. at 1859.

> A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id*. at 1860; *see Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020).

If the case presents a new context, "a *Bivens* remedy will not be available if there are 'special factors counselling hesitation in the absence of affirmative action by Congress.'" *Abbasi*, 137 S. Ct. at 1857 (quoting *Carlson*, 446 U.S. at 18).  The Court has not defined "special factors counselling hesitation," but any such "inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id*. at 1857-58.  Thus, a "special factor" is one that

---

plaintiff's Eighth Amendment claim against the defendant for inappropriate use of a metal-detector wand during a contraband search).

"cause[s] a court to hesitate before answering that question in the affirmative." *Id.*
at 1858.

"There may be many such factors, but two are particularly weighty: the
existence of an alternative remedial structure and separation-of-powers principles."
*Bistrian v. Levi*, 912 F.3d 79, 90 (3d Cir. 2018); *see Hernandez*, 140 S. Ct. at 743
(recognizing that the Supreme Court has "explained that central to [this] analysis
are separation-of-powers principles" (internal quotations and citation omitted)).
"[I]f there is an alternative remedial structure present in a certain case, that alone
may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Abbasi*,
137 S. Ct. at 1858.  Generally, "if there are sound reasons to think Congress might
doubt the efficacy or necessity of a damages remedy as part of the system for
enforcing the law and correcting a wrong, the courts must refrain from creating the
remedy in order to respect the role of Congress in determining the nature and
extent of federal-court jurisdiction under Article III." *Id.*  Courts should consider
"the burdens on Government employees who are sued personally, as well as the
projected costs and consequences to the Government itself." *Id.*  Courts should also
consider whether Congress "has designed its regulatory authority in a guarded way,
making it less likely that Congress would want the Judiciary to interfere." *Id.*; *see*
*Bistrian*, 912 F.3d at 90 (recognizing that Abbasi identified the following as special
factors: "the potential cost to the government of recognizing a private cause of
action, both financially and administratively; whether the judiciary is well suited to
weigh those costs; the necessity to deter future violations; whether Congress has

already acted in that arena, suggesting it does not want the Judiciary to interfere;
whether a claim addresses individual conduct or a broader policy question; whether
litigation would intrude on the function of other branches of government; and
whether national security is at stake."  (internal quotations and citation omitted)).

In the Third Amended Complaint, Plaintiff claims that his rights under the
First, Fifth, Sixth, Eighth, and Fourteenth Amendments have been violated.
Specifically, he lists his claims as follows: "The [F]irst Amendment, the freedom of
speech, to petition the Government for a redress of grievances; The [F]i[f]th
Amendment, [n]or shall be compelled in any criminal case to be a witness [a]gainst
himself, the Sixth, Eight[h] and Fourteenth Amendments[;] The deliberate and
reckles[s m]edical indif[f]erence to Plaintiff . . . Unrestricted Access to the Courts
free f[rom] Retaliation, [t]o not be deprived of Liberty and property."  (Doc. 34 at
39).[25]  With the exception of the Eighth Amendment claim regarding medical
treatment, Plaintiff's claims are not viable under *Bivens*.  Insofar as Plaintiff raises
claims of retaliation, access to courts,[26] deprivation of liberty and property, denial of

---

[25] The Eleventh Circuit listed Plaintiff's claims as follows: "His complaint alleged that the named
defendants acted with deliberate and reckless indifference to his medical needs, violated his
access to the courts, and deprived him of his liberty and property in violation of the First, Fifth, Sixth, Eighth,
and Fourteenth Amendments."  (Doc. 116 at 6).

[26] Notably, Plaintiff has not properly stated an access-to-courts claim as he has not alleged an actual
injury.  *See Al-Amin v. Smith*, 511 F.3d 1317, 1332 (11th Cir. 2008) ("[T]he Supreme Court clarified
that 'actual injury' is a constitutional prerequisite to an inmate's access-to-courts claim." (quoting
*Lewis v. Casey*, 518 U.S. 343, 349-50 (1996))).  Plaintiff's other civil rights case (case no. 5:15-cv-635-
Oc-10PRL) was dismissed without prejudice for Plaintiff's failure to pay the filing fee or file a request
to proceed *in forma pauperis* within 30 days.  *See* (Doc. 34-1 at 8); *see also* Order of Dismissal (Doc. 4)
and Order (Doc. 8) (denying Plaintiff's request for reconsideration), case no. 5:15-cv-635-Oc-10PRL
(M.D. Fla.).  None of the Defendants' alleged actions affected the outcome of that case.

Additionally, although not stated in his Third Amended Complaint, which is itself fatal to his
claim, in Plaintiff's filings related to the Motion to Dismiss, Plaintiff alleges that Defendants' actions
affected his ability to appeal from his criminal case.  However, Plaintiff, through counsel, appealed

due process with respect to being placed in the SHU, and alleged compulsion to be a witness against oneself,[27] such claims are meaningfully different than the claims previously recognized by the Supreme Court in *Bivens*, *Davis*, and *Carlson*. Importantly, the Supreme Court has not extended *Bivens* to claims under the First, Sixth, or Fourteenth Amendments.  Thus, Plaintiff's claims arise in a new context, and the Court must consider whether special factors counsel hesitation in extending *Bivens* in this instance.

One "special factor" to consider is whether Plaintiff had an alternative remedy available to redress the alleged harm.  *See Abbasi*, 137 S. Ct. at 1858 ("For if Congress has created 'any alternative, existing process for protecting the [injured party's] interest' that itself may 'amoun[t] to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.'" (quoting *Wilkie*, 551 U.S. at 550)).  Plaintiff used the prison's informal resolution

---

his criminal conviction and sentence, and on March 26, 2015, the Third Circuit Court of Appeals affirmed Plaintiff's conviction and sentence.  *See United States v. Montalban*, 604 F. App'x 100 (3d Cir. 2015).

Insofar as Plaintiff argues that he could not file a section 2255 motion without his legal property, he has not alleged—in the Third Amended Complaint or otherwise—what claims he would have raised. *See Ferguson v. Warden, Everglades Re-Entry Ctr.,* 714 F. App'x 966, 967 (11th Cir. 2018) ("A plaintiff seeking to prove an access to the courts claim must identify in his complaint a nonfrivolous, arguable underlying claim" for which he suffered prejudice "in a criminal appeal, postconviction motion, or civil rights action." (quotations and citations omitted)).  Regardless, Plaintiff acknowledges that his property was lost either prior to or during his 2014 transport.  None of the named Defendants had anything to do with his property being lost.  *See* (Doc. 124 at 38) (response to Plaintiff's inmate request dated October 23, 2015: "I have attempted to locate the legal property that you claim was left at U.S.P. Canaan when you transferred.  According to the staff there, R&D, SHU, and Unit team, there is no property there."); *see also id.* at 39, 63. Plaintiff arrived at FCC Coleman with "zero property."  (Doc. 129 at 5); *see also* (Doc. 129-2 at 4) (acknowledging that his property was lost or intentionally destroyed "by the staff members of" USP-Canaan).

[27] Plaintiff clarifies in his Response that his Fifth Amendment claim is against the two John Doe officers who allegedly asked him questions about his criminal case without his lawyer present.  *See* (Doc. 129-5 at 5).  Plaintiff states he remained silent and then they retaliated against him by placing him in the SHU without an incident report.  *See id.*; *see also* (Doc. 129 at 25).

and administrative remedy process, which offered him an alternative remedial structure. Even assuming those processes were unavailable to Plaintiff, however, there are other factors counseling hesitation.

Specifically, there is "legislative action suggesting that Congress does not want a damages remedy" in the circumstances Plaintiff describes. *Abbasi*, 137 S. Ct. at 1865. In 1995, Congress passed the PLRA.

> [The PLRA] made comprehensive changes to the way prisoner abuse claims must be brought in federal court. *See* 42 U.S.C. § 1997e. So it seems clear that Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs. This Court has said in dicta that the Act's exhaustion provisions would apply to *Bivens* suits. *See Porter v. Nussle*, 534 U.S. 516, 524 (2002). **But the Act itself does not provide for a standalone damages remedy against federal jailers.** It could be argued that this suggests Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment.

*Abbasi*, 137 S. Ct. at 1865 (internal citations modified and emphasis added). Given Congress's active role in the area of prisoners' rights, this factor causes the Court to "hesitate" and weighs against extending a *Bivens* remedy in this case.

Finally, courts have historically exercised judicial restraint in cases implicating prison administration. "Prison administration is . . . a task that has been committed to the responsibility of . . . [the legislative and executive] branches, and separation of powers concerns counsel a policy of judicial restraint." *Turner v. Safley*, 482 U.S. 78, 85 (1987); *see also Abbassi*, 137 S. Ct. at 1857 ("When a party seeks to assert an implied cause of action under the Constitution itself, . . .

separation-of-powers principles are or should be central to the analysis.").  Housing classifications, handling of inmate mail and property, and the like implicate prison administration.  Congress is better suited to balance the challenges that prison staff face in the day-to-day management of a prison against the expansion of the private right of action for damages.

In sum, significant reasons counsel against extending *Bivens* remedies to Plaintiff under the facts alleged; thus, the Court declines to do so.  Plaintiff's First, Fifth, Sixth, and Fourteenth Amendment claims are due to be dismissed.[28]

b.  Eighth Amendment Deliberate Indifference Claims[29]

Plaintiff claims that Defendants were deliberately indifferent to his serious medical needs. Defendants argue they are entitled to qualified immunity, because Plaintiff has failed to state a deliberate indifference claim against them.

"'Qualified immunity protects government officials from liability for civil damages unless they violate a statutory or constitutional right that was clearly established at the time the alleged violation took place.'" *Waldron v. Spicher*, 954 F.3d 1297, 1303 (11th Cir. 2020) (quoting *Gilmore v. Hodges*, 738 F.3d 266, 272 (11th Cir. 2013)).  When a defendant raises a qualified-immunity defense, courts engage in a two-part analysis.  First, "'[a]n officer asserting a qualified-immunity defense bears the initial burden of showing that he was acting within his

---

[28] Although the John Doe Defendants have not been identified or served, the Court's finding that Plaintiff has failed to state a claim applies equally to them.  *See* 28 U.S.C. § 1915(e)(2)(B).

[29] In addressing Defendants' arguments that Plaintiff has failed to state a plausible Eighth Amendment claim, the Court accepts as true Plaintiff's factual allegations in the Third Amended Complaint and Supplements (Docs. 34, 36, 37) and construes them in the light more favorable to Plaintiff.

discretionary authority.'" *Patel v. Lanier Cnty. Ga.*, 969 F.3d 1173, 1181 (11th Cir. 2020) (quoting *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 951 (11th Cir. 2019)).  "If, interpreting the evidence in the light most favorable to the plaintiff, the court concludes that the defendant was engaged in a discretionary function, then the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity."  *Waldron*, 954 F.3d at 1303 (quotation and citation omitted).  To do so, a plaintiff must show that the defendant violated his constitutional rights, "and that the right at issue was 'clearly established' at the time of the defendant's alleged misconduct."  *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  "Generally speaking, it is proper to grant a motion to dismiss on qualified immunity grounds when the 'complaint fails to allege the violation of a clearly established constitutional right.'" *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (quoting *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002)).

Here, Defendants were acting as correctional employees or medical staff at the time of the alleged incidents.  Their actions were undertaken in performance of their duties and within the scope of their authority. *See Johnson v. Fee*, 2020 WL 7244922, at *3 (11th Cir. Dec. 9, 2020).  Thus, Defendants were acting within their discretionary authority, and the burden shifts to Plaintiff to demonstrate that Defendants violated his Eighth Amendment rights and the right was clearly established.

"To set out a claim for deliberate indifference to medical need, [the plaintiff] must make three showings: (1) he had a serious medical need; (2) the [defendant]

w[as] deliberately indifferent to that need; and (3) the [defendant's] deliberate indifference and [the plaintiff's] injury were causally related. *Hinson v. Bias*, 927 F.3d 1103, 1121 (11th Cir. 2019).

> A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition. In either case, the medical need must be one that, if left unattended, poses a substantial risk of serious harm.

*Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009) (quotations and citation omitted); *see Patel v. Lanier Cnty. Ga.*, 969 F.3d 1173, 1188 (11th Cir. 2020).

Deliberate indifference to a serious medical need requires "three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Farrow v. West*, 320 F.3d 1235, 1245 (11th Cir. 2003) (citations omitted); *see Patel*, 969 F.3d at 1188-89 & n.10 (recognizing "a tension within [Eleventh Circuit] precedent regarding the minimum standard for culpability under the deliberate-indifference standard," as some cases have used "more than *gross* negligence" while others have used "more than *mere* negligence"; finding, however, that it may be "a distinction without a difference" because "no matter how serious the negligence, conduct that can't fairly be characterized as *reckless* won't meet the Supreme Court's standard" (citations omitted)). "Subjective knowledge of the risk requires that the defendant be 'aware of facts from which the inference could be drawn that a substantial risk of serious

harm exists, and he must also draw the inference.'"  *Dang*, 871 F.3d at 1280

(quoting *Caldwell v. Warden, FCI Talladega*, 784 F.3d 1090, 1099-1100 (11th Cir.

2014)).

> An official disregards a serious risk by more than mere negligence "when he [or she] knows that an inmate is in serious need of medical care, but he [or she] fails or refuses to obtain medical treatment for the inmate." *Lancaster v. Monroe Cnty., Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997), *overruled on other grounds by LeFrere v. Quezada*, 588 F.3d 1317, 1318 (11th Cir. 2009).  Even when medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs.  *See Harris v. Coweta Cnty.*, 21 F.3d 388, 393-94 (11th Cir. 1994) (citing *Brown v. Hughes*, 894 F.2d 1533, 1537-39 (11th Cir. 1990)).[30]  Further, "medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989) (citations omitted).  However, medical treatment violates the Constitution only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986) (citation omitted).

*Dang*, 871 F.3d at 1280 (some internal citations modified).  "'[I]mputed or collective

knowledge cannot serve as the basis for a claim of deliberate indifference.  Each

individual defendant must be judged separately and on the basis of what that

---

[30] "Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (citation omitted).  However, "[i]t is also true that when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989) (citing *Hamm*, 774 F.2d at 1575); *see Boone v. Gaxiola*, 665 F. App'x 772, 774 (11th Cir. 2016).

person kn[ew].'" *Id.* (quoting *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008)).

Even liberally construing Plaintiff's allegations in his Third Amended Complaint, he has failed to state an Eighth Amendment deliberate indifference claim against any of the Defendants. His allegations as to Defendants Smith, Boley, McLean, Phillips, and Heuett are vague and conclusory. Plaintiff alleges that he told Smith, Boley, and McLean (who are not medical professionals) that he needed medical care for his collarbone, and they advised him to go to health services to address his concerns. They further advised him that he needed to submit a BP-9 directly to the Warden. Additionally, Plaintiff concludes that Phillips and Heuett, who are also not medical professionals, denied him medical care but Plaintiff fails to explain how. None of Plaintiff's assertions as to Smith, Boley, McLean, Phillips, and Heuett are sufficient to state an Eighth Amendment deliberate indifference claim against them. Thus, these Defendants are entitled to qualified immunity because Plaintiff has failed to state a violation of his constitutional rights.

As to Defendants Nikbak and Tidwell, Plaintiff's allegations reflect that he is dissatisfied with the care and treatment he received, which does not rise to the level of deliberate indifference. Nikbak saw Plaintiff when he first arrived at FCC Coleman and reviewed Plaintiff's medical history with him. When Plaintiff told Nikbak about his medical issues, Nikbak advised Plaintiff that he needed to be in population to be consulted and diagnosed and that Nikbak would see Plaintiff on the compound. Then, when Nikbak was seeing Plaintiff in relation to his collarbone

injury, Nikbak provided Plaintiff with two weeks of pain medication, but Plaintiff apparently wanted a different course of treatment.[31]  However, "'a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment' does not support a claim of deliberate indifference." *Melton v. Abston*, 841 F.3d 1207, 1224 (11th Cir. 2016) (quoting *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991)).  That Plaintiff wanted Nikbak to do more does not—alone—render Nikbak deliberately indifferent.  *See Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) ("[T]he question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." (quoting *Estelle*, 429 U.S. at 107)); *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) ("Although [the inmate] may have desired different modes of treatment, the care the jail provided did not amount to deliberate indifference.").  Moreover, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Harris*, 941 F.2d at 1507 (quotation and citation omitted)).

---

[31] Nikbak examined Plaintiff when Plaintiff returned from the hospital on July 23, 2014.  *See* (Doc. 37 at 5-9).  It appears that in addition to medication, Nikbak ordered an x-ray and an orthopedic surgery consultation.  *See id*. at 6.  He also completed at Medical Duty Status form indicating Plaintiff should be assigned to a lower bunk, and that he may have a neck brace and a splint on his finger.  *See id.* at 9.  Nikbak amended his medication order the following day.  *See id.* at 8.

As it relates to Plaintiff's "seizures," Plaintiff describes two encounters with Nikbak: the first during Plaintiff's arrival at FCC Coleman when Nikbak reviewed Plaintiff's medical history and advised Plaintiff he would see him on the compound; and the second, when Nikbak was focused on Plaintiff's collarbone injury. A complaint that a physician has been negligent "in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011) (quotation marks and citation omitted). Plaintiff has not alleged facts that would suggest Nikbak acted with deliberate indifference to any of Plaintiff's medical conditions.

Finally, Plaintiff also vaguely claims that Nikbak was responsible for a 5-month delay in Plaintiff receiving surgery for his collarbone, but he does not allege what Nikbak did or did not do to cause any such delay. Notably, the records show that Nikbak requested an orthopedic surgery consultation on July 23, 2014, *see* (Doc. 37 at 6), and on September 22, 2014, the consultation was approved. *See* (Doc. 34-1 at 55). Plaintiff's conclusory assertions of deliberate indifference are insufficient to state an Eighth Amendment deliberate indifference claim against Nikbak.

As to Tidwell, Plaintiff describes his encounters with Tidwell and then concludes that Tidwell delayed his medical treatment and acted with deliberate indifference toward his medical needs. Again, his conclusions are not supported by factual statements describing Tidwell's acts or omissions that resulted in a violation of Plaintiff's rights. That Tidwell did not tell Plaintiff about his eye does not render

Tidwell deliberately indifferent.  The Court notes that Plaintiff received medical treatment for his eye injury.  On August 27, 2014, a physician requested a radiology consultation due to Plaintiff's "[h]istory of trauma for f/u equivocal [sic] fx rt orbit eye" and further noted that a consult was pending from Plaintiff's prior institution. (Doc. 34-2 at 10) (capitalization omitted).  In December 2014, Plaintiff had a CT which revealed "[c]hronic fractures of the right lamina papyracea and orbital floor." (Doc. 34-1 at 51).  Also in December 2014, there was a request pending for an ophthalmology and plastic surgery consultation, *id*. at 52, and Plaintiff was notified that the request for plastic surgery was pending region review, *id*. at 54.  In May 2015, Plaintiff was referred to oral maxillofacial for evaluation and management. *Id*. at 53.  Plaintiff may not have received the treatment he desired or even treatment as quickly as he desired, but he fails to allege facts suggesting that Tidwell was deliberately indifferent to Plaintiff's serious medical needs.

Although prisoners are entitled to medical care, "the Eighth Amendment doesn't require it to be perfect, the best obtainable, or even very good." *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1271 (11th Cir. 2020) (internal quotations and citation omitted).  Upon review of Plaintiff's allegations, the Court finds that Nikbak and Tidwell are entitled to qualified immunity on Plaintiff's Eighth Amendment deliberate indifference claims because Plaintiff has failed to state a claim against them.

## VI.    Conclusion

In sum, the Court finds Plaintiff failed to exhaust his administrative remedies prior to filing this case.  Alternatively, the Court finds Plaintiff has failed to state a claim against any of the Defendants.  The Court has already afforded Plaintiff multiple opportunities to amend; therefore, this case is due to be dismissed.  Accordingly, it is

**ORDERED**:

1.     Plaintiff's motions (Docs. 132, 133, 134, 136, 138) are **GRANTED to the extent** that the Court accepts the filings and construes them as supplemental responses.

2.     Defendants' Motion to Dismiss (Doc. 124) is **GRANTED**.

3.     The **Clerk** shall enter judgment dismissing this case, terminate any pending motions, and close the file.

**DONE AND ORDERED** at Tampa, Florida, this 26th day of January, 2021.

_____

**TOM BARBER**
**UNITED STATES DISTRICT JUDGE**

JAX-3 1/19
c:
Jose Montalban
Counsel of Record

43